IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| KING D'MARCUS-LOINU PAYE,<br><br>          Plaintiff,<br>     v.<br><br>SGT. SHERRILL, CO MASON, and C.O. BRADY,<br><br>          Defendants. | Case No.: 3:23-cv-01115-AN<br><br>OPINION AND ORDER |

Plaintiff King D'marcus-Loinu Paye brings this action against defendants Sgt. Sherrill ("Sherill"), CO Mason ("Mason"), C.O. Brady ("Brady"), and "All the Deputies that Participated," alleging deprivations of his civil rights under 42 U.S.C. § 1983. Defendants move for summary judgment. For the reasons that follow, defendants' motion is GRANTED, and this case is DISMISSED.

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine issue of material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). "Material facts are those which might affect the outcome of the suit." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Materiality is determined using substantive law. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When a moving party demonstrates the absence of a genuine dispute as to any material fact, the nonmoving party that bears the burden at trial must show in response that there is evidence creating a genuine dispute as to any material fact. *Rivera*, 395 F.3d at 1146 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986)). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir.

2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

## BACKGROUND

Plaintiff was an adult in custody ("AIC") at the Multnomah County Detention Center ("MCDC") at the time of the alleged incident. The parties do not dispute that on May 31, 2023, plaintiff was involved in a physical altercation with another AIC on the second level of a detention unit. Compl., ECF [4], at 3 (all references to ECF pagination).[1]

Plaintiff alleges that Sherrill, a corrections officer, approached him after the fight was over and he was walking away from the other AIC. *Id.* In plaintiff's recounting, supported by a later purported[2] declaration, Sherrill immediately sprayed "pepper spray" (which defendants refer to as oleoresin capsicum spray, or "OC spray") at plaintiff "multiple times without warning" on his face, hair, back, and upper body. *Id.*; Pl. Resp., ECF [27], at 2. Sherrill states that he saw the fight while it was still in progress, ordered plaintiff and the other AIC to stop fighting, warned them that he would spray OC spray on them if they continued to fight, and only then, after plaintiff and the other AIC continued to fight, did he spray them. Decl. Eric Sherrill ("Sherrill Decl."), ECF [19], ¶¶ 2-4.

Defendants submitted security camera footage of the upper tier of Unit 5-A of MCDC, where the altercation occurred, on May 31, 2023. *See generally* Pedro Decl. ¶ 5 & Exs. 2, 3. In that footage, two AICs begin to fight in the corner of the upper tier. There is no audio, and it is not possible to see what the officers are doing prior to entering the camera's view. A person who is presumably Sherrill rushes into frame while the AICs are still fighting. He sprays both people with a black canister, and they immediately separate. The AIC to the left, who is presumably plaintiff, takes a knee, and the other AIC walks away to the right. Plaintiff then stands up, turns, and walks to the left with his hands up, while Sherrill maintains a

---

[1] This document is labeled the "Amended Complaint" at ECF [4]. No prior complaint was filed, however, and the filing titled "Complaint" at ECF [2] appears to be exhibits in support of the complaint. Accordingly, the filing at ECF [4] will be referred to as the "Complaint" throughout this order.

[2] Plaintiff's response consists of a single document containing a "Declaration," a "Statement of Disputed Factual Issues," and a legal memorandum that is not signed.

taser trained on him. Plaintiff alleges that he was walking away from the cloud of OC spray to avoid exposure. Compl. 3.

In the footage, Sherrill follows behind plaintiff as he walks along the hallway, toward a group of three officers rushing up the stairs, with his taser raised. The other AIC involved in the altercation lies down face first on the floor and is handcuffed by three officers. Sherrill states that he ordered plaintiff and the other AIC to get on the ground, but plaintiff rose from a kneeling position and began walking in the direction of corrections staff. Sherrill Decl. ¶ 5. Believing plaintiff to be a risk to the corrections staff, Sherrill ordered him to get on the ground "several times" and warned that he would use a taser if he refused to comply. *Id.* ¶ 7. Mason confirms that he was in the unit at the time and heard Sherrill order plaintiff to get on the ground or he would use a taser. Decl. Marcus Mason ("Mason Decl."), ECF [20], ¶ 2. In the video, plaintiff drops his arms to his sides while walking, then raises them again and faces the wall, placing his hands there. Plaintiff alleges that he was still trying to find clean air to breathe and deliberately placed his hands on the wall in a non-threatening manner. Compl. 3-4. About one second after plaintiff places his hands on the wall, Sherrill deploys the taser, causing plaintiff to fall to the ground. *See generally* Pedro Decl. Exs. 2, 3. Sherrill states that he tased plaintiff after he disregarded his orders so that other officers could restrain him. *Id.* ¶ 8.

Plaintiff fell to the ground in a seated position on the ground after being tased. In the footage, two officers rotate plaintiff's body forward, causing him to lie face down on the ground, and a third officer joins them to handcuff him. When this happens, plaintiff's head is placed between the railings of the upper tier guardrail, causing his face and head to extend out past the railing. Plaintiff's head is in that position for about fifty seconds. *See generally* Pedro Decl. ¶ 5 & Exs. 2, 3. Plaintiff alleges that having his head in this position was humiliating and made him look as if he was about to be beheaded. Compl. 3. Mason affirmed that he was one of the officers who restrained plaintiff, and says that he "was unaware that, for a brief time while [he] was securing [plaintiff] in handcuffs, [plaintiff] was positioned on the ground in such a way that his head was in between bars of the upper tier railing." Mason Decl. ¶ 4. Although plaintiff alleges that an Officer Brady also participated in placing handcuffs on him, defendants state that no record

3

exists of a corrections officer named "Brady" employed at MCDC during the time relevant to this lawsuit. Decl. Brandon Pedro ("Pedro Decl."), ECF [21], ¶ 3.

After plaintiff was handcuffed, Mason (and, plaintiff alleges, Brady), escorted him to the medical unit. Mason Decl. ¶ 5. Plaintiff alleges that as they escorted him, the officers made "derogatory comments about [his] charges," which he maintains resulted in a wrongful conviction. Compl. 4. Plaintiff alleges that in the medical unit, his eyes were washed with cold water. *Id.* He alleges that upon return to his cell he discovered "feces . . . in the corners of the walls an [sic] smeared on the right an [sic] back side of the wall." *Id.* at 5. He tried to run the cold water in his sink, but it only produced lukewarm and hot water. *Id.* Plaintiff used the intercom to report that his cold water was not working; in response, he was told that a sergeant would be arriving shortly to serve him a misconduct report, and any issues should be raised with that person. *Id.*

Sherrill arrived at approximately 9:30 p.m. and issued plaintiff a misconduct report. *Id.* Plaintiff alleges that he informed Sherrill that he needed to be moved to a new cell because of the feces on the wall and that he needed a cold shower or a rag with cold water to wash the pepper spray off his face, hair, back, and upper body. *Id.* Sherrill told plaintiff that he should decontaminate himself in the sink. *Id.* at 6. When plaintiff explained that he could not do so because warm water would reactivate the pepper spray, plaintiff alleges that Sherrill told him to "figure it out." *Id.*

The Multnomah County Sherriff's Office ("MCSO") maintains use of force guidance for MCDC. Pedro Decl. ¶ 4 & Ex. 1. That guidance permits officers to use physical force when they reasonably believe it is necessary, under the totality of the circumstances, to "[m]aintain the safety and security of [MCSO] members, other Multnomah County employees, their parties, or the general public in a Multnomah County facility." Pedro Decl. Ex. 1, § 8.9.4.

Plaintiff filed the complaint on September 8, 2023. He alleges that Sherrill used excessive force, violating the Eighth Amendment, when Sherrill used OC spray on plaintiff and tased him with no prior warning. *Id.* at 7-8. Plaintiff alleges that Mason and Brady used excessive force, violating the Eighth Amendment, by "hanging [his] head between the top tier railing, humiliating [him] by making him look as

4

if he was planning or about to be beheaded." *Id.* at 8-9. Plaintiff alleges that these incidents caused him pain, suffering, and emotional distress. *Id.*

On March 19, 2024, defendants filed the instant motion for summary judgment. Defs. Mot. for Summ. J. ("MSJ"), ECF [18].

## DISCUSSION

Defendants move for summary judgment on all of plaintiff's claims. First, defendants argue that plaintiff cannot show, as a matter of law, that Sherrill or Mason used excessive force against him in violation of his Eighth Amendment rights. MSJ 3.

"In order to survive a motion for summary judgment on a § 1983 claim, the plaintiff must establish a genuine issue of material fact that the defendant (1) acted under the color of state law, and (2) deprived him of a constitutional right." *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009) (citing *Levine v. City of Alameda*, 525 F.3d 903, 905 (9th Cir. 2008)).

The Eighth Amendment commands that "cruel and unusual punishments [shall not be] inflicted" by the government. U.S. Const. amend. VIII. It is "the settled rule that 'the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (citation modified) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). To prove an excessive force claim related to a disciplinary action, a plaintiff must show that the "actions were not 'a good faith effort to maintain or restore discipline,' and that [the prison official] instead acted 'maliciously and sadistically for the very purpose of causing harm.'" *Simmons v. Arnett*, 47 F.4th 927, 932 (9th Cir. 2022) (quoting *Whitley*, 475 U.S. at 320-21).

Courts must look at several factors when determining whether a prison official acted malicious and sadistically, including "the need for application of force, the relationship between the need for force and the amount of force used, any effort made to temper the severity of the force used, and the extent of the threat to the safety of staff and inmates." *Id.* at 933. Prison officials should be given "'wide-ranging deference' when they are exercising their judgment to maintain prison safety." *Id.*

Sherrill's use of OC spray was objectively reasonable under the circumstances, defendants

5

argue, because the fight between the two AICs was a threat to jail security. MSJ 7. Sherrill believed that using OC spray was "the most effective way to stop the fight, maintain order and security of the unit, and reduce the possibility of injury to the AICs, himself[,] and other responding corrections staff." *Id.* Defendants argue that Sherill's use of the taser was similarly a good faith effort to restore discipline, given the fact that plaintiff was disobeying orders and walking toward corrections staff, and not a malicious or sadistic act for the purpose of causing harm. *Id.* Defendants note that although plaintiff had placed his hands on the wall, he could have been "merely feigning passivity," and that his "combative behavior, his defiance of orders to get on the ground, and the increased risk of harm that posed to responding corrections staff" justified use of the taser. *Id.* Plaintiff argues that there is a genuine dispute over whether Sherrill did give verbal warnings about the OC spray or the taser and whether Sherrill ordered plaintiff to stop fighting or get on the ground, which should preclude summary judgment. Pl. Resp. 2.

Violence in a jail or correctional facility is a threat to jail security, and it is reasonable for corrections officers to intervene using force in such circumstances. *See Segura v. Cherno*, No. 6:21-cv-0740-YY, 2022 WL 3587860, at *6 (D. Or. May 25, 2022) (collecting cases), *report and recommendation adopted*, No. 6:21-CV-0740-YY, 2022 WL 3586721 (D. Or. Aug. 22, 2022). In general, "a limited amount of pepper spray used by officers to break up a fight is both justified and proportional, considering the need for force and jail 'policies and practices needed to maintain order and institutional security.'" *Id.* at *7 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 399-400 (2015)) (collecting cases). Here, Sherrill briefly used OC spray to break up the fight between plaintiff and the other AIC, in accordance with MCSO guidance. After plaintiff was restrained, officers brought plaintiff to the medical unit to wash his eyes, tempering the severity of the use of OC spray. *See Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) ("[Prison] staff made an effort to temper the severity of their forceful response by allowing [the plaintiff] to decontaminate, and giving him medical treatment."). Considering these factors, Sherrill's use of OC spray was a good faith effort to restore discipline and not done for the purpose of causing harm.

The use of the taser also does not constitute excessive use of force. Although Sherrill deployed the taser after the fight between the AICs had ceased, he did so based on his judgment that plaintiff

6

continued to pose a risk to corrections staff because he was upright, ignoring commands to get on the ground, and moving toward corrections officers. Although plaintiff had put his hands on the wall, it was still plausible that, in Sherrill's judgment as a corrections officer, plaintiff continued to pose a risk. Deferring to Sherrill's judgment, as the Court must, the use of the taser was a good faith effort to maintain and restore discipline, and not to cause harm.

Even assuming that Sherrill did not give verbal commands or warnings, as plaintiff contends, Sherill's actions would still not constitute excessive use of force. *Hernandez v. Woods*, 731 F. App'x 643, 645-46 (9th Cir. 2018) (citing *Hudson*, 503 U.S. at 6-7; *Spain v. Procunier*, 600 F.2d 189, 195-96 (9th Cir. 1979)) ("Even assuming [the AIC] did not receive warnings, as he claims, there is no genuine dispute that the force used—two bursts of [OC spray] and then, when the inmates continued fighting, up to two 'Exact Impact' non-lethal block rounds—was 'applied in a good-faith effort to maintain or restore discipline' and proportional to the potentially deadly fight."). Accordingly, summary judgment is granted as to the claims against Sherrill.

As to Mason, defendants argue that plaintiff's claim fails simply because there is no allegation that any pain was inflicted. *Id.* at 9-10. Plaintiff alleges that Mason put his head between the railing bars while putting him in handcuffs but does not allege any pain or injury. Defendants further argue that the security video shows that Mason did not purposefully place plaintiff's head between the bars, and that Mason was not even aware it was happening, showing that Mason did not act with intent, let alone maliciously and sadistically. *Id.* at 10. Plaintiff argues that the evidence shows that Mason acted intentionally to humiliate him. Pl. Resp. 3-5.

It is evident from the security video footage and from Mason's declaration that plaintiff's head was briefly and unintentionally held between the railings. This sort of inadvertent conduct was not undertaken by Mason maliciously and sadistically for the purpose of causing harm. *See Whitley*, 475 U.S. at 319 ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause[.]"). Accordingly, the summary judgment is granted as to the claim against Mason.

7

Neither side addresses Brady, and based on Pedro's declaration, it appears that Brady does not exist. However, even if Brady did exist, or if plaintiff were referring to a differently named officer among the three who handcuffed him, the analysis would be the same as that regarding Mason's conduct. Plaintiff's claims against Brady fail as a matter of law because briefly and unintentionally placing plaintiff's head through the railings does not constitute excessive use of force.

Defendants also argue that they are entitled to qualified immunity. MSJ 10. Having resolved this case on the question of excessive force, however, the Court need not reach this issue.

## CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment, ECF [18], is GRANTED, and this case is DISMISSED. Plaintiff's Motion for Appointment of Counsel, ECF [31], is DENIED as moot.

IT IS SO ORDERED.

DATED this 21st day of July, 2025.

Adrienne Nelson
United States District Judge